(136 So. 283)

## INTERSTATE ELECTRIC CO. v. FRANK ADAM ELECTRIC CO.

No. 27451.

June 22, 1931.

Rehearing Denied July 17, 1931.

E. J. Thilborger and J. J. Cullinane, both of New Orleans, for appellant.

Lemle, Moreno & Lemle, of New Orleans, for appellee.

ODOM, J.

Defendant prosecutes this appeal from a judgment for $2,189.55, rendered against it for damages resulting from its alleged violation of a contract of sale.

Plaintiff alleged and the record shows that it is engaged in the business of selling at wholesale electrical material in the city of New Orleans; that the defendant, Frank Adam Electric Company, domiciled in St. Louis, is engaged in the manufacture of electrical switchboards, junctions, boxes, and cabinets, and had an office in New Orleans under the management of W. J. Keller; that the Douglass Electric Construction Company, Limited, of New Orleans, had a contract to install in Hotel Dieu certain switchboards, boxes, and panels, which it agreed to purchase from plaintiff at the stipulated price of $6,464.55. It is alleged and contended by plaintiff that when it received the order from the Douglass Company for the material and fixtures, it immediately placed an order for the purchase of the same with the Frank Adam Company through its resident manager, W. J. Keller, who had authority to bind his principal, and that said Keller, for his principal, agreed to sell said supplies to plaintiff for the sum of $4,275, and that the defendant company, after accepting the order, refused to comply with its contract by shipping the material and supplies, making it impossible for plaintiff to carry out its contract with the Douglass Company; and that plaintiff was thereby damaged in the sum of $2,189.55, the difference between the price at which the supplies were sold to the Douglass Company and the price at which the defendant agreed to sell to plaintiff.

1. Defendant set up two defenses: First, that W. J. Keller was not clothed with power and authority to bind it in the premises; and,

second, that no specifications accompanied the "purported order" for the supplies.

We find no merit in these defenses. Defendant is a manufacturer domiciled in St. Louis. At the time this transaction took place, and for many years prior thereto, it maintained an office in New Orleans in charge of a general manager.

It made no sales direct to consumers or contractors, but all sales were made through jobbers. Its general manager looked after its interest, and when he received an order for goods he directed the prospective purchaser or consumer to place the order with a jobber, which in this case was the plaintiff company. The testimony conclusively shows that for many years plaintiff had been purchasing goods from the defendant company through defendant's local, resident manager, who made all contracts and fixed the prices, and that never until this transaction arose did defendant intimate to plaintiff that its local manager did not have full authority to bind it. All orders for goods were placed with defendant's manager, who fixed the prices, made the contracts, sent them to headquarters, where they were accepted and filled without question.

Originally, defendant had a local or resident manager in New Orleans named Reed. While Reed was its manager, the defendant company specifically informed plaintiff that he was clothed with full power and authority to bind it in the fixing of prices and the making of contracts. W. J. Keller succeeded Reed as defendant's local manager in New Orleans about a year and a half previous to the date on which this contract was made, and when he did, defendant notified plaintiff that Keller had succeeded Reed as local manager, and thereafter plaintiff continued to deal with Keller as it had previously dealt with Reed. There was never the slightest intimation by

defendant that Keller did not have the same authority that Reed had, and it is shown that the prices and contracts made by Keller for his principal were, without a single exception, carried out by defendant.

We find at page 85 of the record the following admission:

"It is admitted that if Mr. Fred Adam (who was at the head of defendant company) were placed on the stand he would testify that Mr. Keller is his district manager; that in the ordinary course of business orders placed with Mr. Keller by jobbers would be forwarded to the home factory *and would be acknowledged by the home factory to the jobber,* and that Mr. Keller is the only one in the city or the state who represents the Frank Adam Company." (Italics ours.)

Bearing in mind that defendant, in its answer, denied that Keller had "power and authority" to bind it and tendered his lack of such authority as its principal defense, it is quite significant that counsel did not have read into the record the admission that if Fred Adam were placed on the stand he would swear that Keller had no authority to bind the company, if that were true. The presumption is that the above admission sets out in substance all that could have been proved by Mr. Adam had he taken the stand. The admission is that Mr. Adam would swear that Keller was the defendant's general manager in this territory and that when orders were placed with him by jobbers they "would be forwarded to the home factory and would be *acknowledged* by the home factory." (Italics ours.)

That is precisely what took place in the instant case. Plaintiff placed the order with Keller on June 13, 1923, and notified the defendant to that effect. Just when the order was received is not clear. On June 29 defendant wrote plaintiff as follows:

"Replying to your postcard dated June 27, would state that we have not yet received the order referred to."

However, that the order was received is shown by a letter dated October 1, 1923, written by defendant's St. Louis attorney to plaintiff, in which it is stated:

"The Frank Adam Electric Company has handed me what purports to be your order, number 4181, dated New Orleans, June 13, 1923, and addressed to the Frank Adam Electric Co. at St. Louis."

Mr. Keller says he sent the order to defendant about August 27.

There is no testimony showing that defendant then repudiated the contract. The first intimation that plaintiff had of defendant's refusal to accept the order was conveyed in the letter of defendant's attorney, dated October 1.

Mr. Keller admits that when he received the order from plaintiff, he took it to his office and that five hours later he went back to plaintiff's office and informed Mr. Stern that he had phoned the home office and received the information that the order was accepted at the price he had fixed. He now admits, however, that he had done nothing of the kind.

Keller testified that he had no general authority to bind his company, that he sold on commission, and that all orders received by him were sent to the company and were not binding unless approved.

In support of its contention that it was not bound as a matter of law, counsel for defendant cite 2 C. J. 561, § 203, and other authorities to the effect that a principal "will not be bound by the act of the agent in excess of his actual authority." That is the general rule, but that rule is subject to well-known and well-recognized exceptions, as is evi-

denced by the very text cited and quoted by counsel.

It reads in part:

"The principal will not be bound by the act of the agent in excess of his actual authority, within the above rule, *when the third person has knowledge of the extent of the agent's authority, or where the facts and circumstances of the case are such as to put him upon inquiry as to the authority and good faith of the agent."* (Italics ours.)

██ The general rule invoked by defendant has no application to the instant case. The rule applicable here is stated in 2 C. J. 570, § 211, and is as follows:

"While as between the principal and the agent the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof; and as between the principal and third persons the mutual rights and liability are governed by the apparent scope of the agent's authority, which is that authority which the principal holds the agent out as possessing or which he permits the agent to represent that he possesses and which the principal is estopped to deny, and the principal will be bound by all acts of the agent performed in the usual and customary mode of doing the particular business, although he may have acted in violation of private instructions, unless there is something in the nature of the business or the circumstances of the case to indicate that the agent is acting under special instructions or limited powers. This rule applies whether the agency is a general or special one.

"The true limit of the agent's authority to bind the principal as between the principal and third persons is the apparent authority with which the agent is invested, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation, in the absence of circumstances putting him on inquiry, to inquire into the agent's actual authority, as the presumption is that one known to be an agent is acting within the scope of his authority. The fact that the agent's apparent authority is different from the actual authority conferred does not relieve the principal of responsibility.

"Reason for the rule. For the acts of his agent within the express authority the principal is liable, because the act of the agent is the act of the principal. For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons."

See, also, 21 R. C. L. 854, § 34.

██ Defendant had Keller in New Orleans as its general manager and held him out to the trade as having full authority to bind it. Through a long course of dealings with plaintiff similar in character to the one here involved, it had sanctioned and approved all contracts made by him, as well as those made by Reed, who was defendant's general manager before Keller. The contract here involved was in line with and similar in character to those habitually made by these general managers. By its course of conduct and dealings defendant had led plaintiff to believe that Keller had full authority to bind it. More than that, defendant had specifically informed plaintiff that Reed, who preceded Keller as manager, did have such authority, and when Keller succeeded Reed, defendant

informed plaintiff of that fact, but did not give notice that his powers were limited.

If defendant had a private agreement with Keller by which his authority was limited, such agreement was not binding upon plaintiff, which knew nothing of it.

In the case of Johnson v. Manget Bros. Co., 168 La. 317, 122 So. 51, 52, this court quoted approvingly the following from 2 C. J. 566, § 209:

"Secret or private instructions, or limitations on the general authority of an agent, however binding they may be as between the principal and his agent, can have no effect on a third person who deals with the agent in good faith, in ignorance of the instructions or limitations and in reliance on the apparent authority with which the principal has clothed him." Farrar v. Duncan, 29 La. Ann. 126; Chaffe v. Barataria Canning Co., 113 La. 215, 36 So. 943.

■ 2. The second defense is that no specifications accompanied the order. This defense is also without merit for the reason that the specifications were furnished to Keller, defendant's agent. He had a copy of both the contract and the specifications under which the Douglass Company was to install the fixtures and made the price after checking the specifications. Keller was defendant's general manager, and if it needed these specifications, it was Keller's duty to forward them, and according to the testimony, that had been the custom in similar transactions.

■ 3. Defendant filed in this court an exception of no cause of action based upon the ground that plaintiff did not allege that the amount claimed is the difference between the contract price and the market price of the goods.

This court has repeatedly held that the measure of damages for the breach of a con-tract of sale where no fraud is shown is the difference between the contract price and the market price of the goods on the date of the breach. Civ. Code, art. 1934; Benjamin on Sales, pp. 618 and 727; Southern Cotton Oil Co. v. Shreveport Cotton Oil Co., 111 La. 387, 35 So. 610; Hafner Mfg. Co. v. Lieber L. & S. Co., 127 La. 348, 53 So. 646; Oil City Iron Works v. Supply Co., 147 La. 450, 85 So. 201; Bonsor & Co. v. Rice Milling Co., 151 La. 1094, 92 So. 711; Kohlman v. Witherell & Dobbins Co., 155 La. 57, 98 So. 756; Robinson Lmbr. Co. v. Burton et al., 128 La. 120, 54 So. 582.

But the cases do not depart from the general rule that the measure of damages for the breach of a contract to sell is the amount of profit which the vendee would have made had the contract been carried out.

Article 1934 of the Civil Code reads, in part, as follows:

"Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived."

In the case of Hafner Mfg. Co. v. Lieber Lbr. Co., supra, the court on rehearing said (page 363 of 127 La., 53 So. 646, 651):

"Article 1934 of the Civil Code is plain. Loss and profit are the measure of damages. There is no loss save that loss resulting from the profit of which plaintiff was deprived."

Regardless of the rules this court has laid down for determining the amount of damages sustained by the breach of a contract to sell, the law is that "the damages due the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived."

The plaintiff in the instant case had contracted to sell these goods and sued only for the profits anticipated, of which it was de-

prived by defendant's default. That profit is liquidated and certain. It purchased the property for $4,275 and sold or contracted to sell it for $6,464.55, or a net profit of $2,189.55. Its only loss was this profit which it would have made but for defendant's unwarranted default.

The rule that the measure of damages for the breach of a contract of sale is the difference between the contract price and the market price of the goods on the date of the breach is not applicable to this case for two reasons.

In the first place, plaintiff purchased the goods with reference to the contract which it had already made with the Douglass Company, a third person, and this to the knowledge of the defendant, the seller. Defendant's agent, Keller, knew when he accepted plaintiff's order for the goods at $4,275 that plaintiff had contracted to sell them to the Douglass Company at $6,464.55.

Defendant was not guilty of fraud or bad faith and therefore "is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." Civ. Code, art. 1934.

The contract sued on having been made with reference to the one made by plaintiff with the Douglass Company, to the knowledge of defendant, the damages for its breach, which the parties contemplated or were "supposed to have entered into the contemplation of the parties," was the profit on the contract.

In the second place, there was no "market price" for these supplies as that term is generally used. They are manufactured only by the defendant company, which did not sell them in the open market but only to jobbers. The architect's specifications called for goods manufactured by the defendant, and the Douglass Company could use these and no other. The plaintiff could not have gone into the market and purchased the goods necessary to carry out its contract with the Douglass Company for the reason that they were for sale only by the manufacturer, the defendant. A commodity like this is not like shoes, corn, rice, or lumber, which is sold in open market by grade.

The plaintiff had sold these goods, the identical boards and panels which it contracted to purchase from defendant. It could deliver no other panels and boards. It was therefore impossible for plaintiff to do what defendant contends it should have done; that is, to go into the market and purchase goods to supply the Douglass Company's demands. The goods were to be had from the manufacturer and from no other.

The judgment appealed from is affirmed, with costs.

ST. PAUL, J., dissents.